IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

| | |
|---|---|
| UNITED STATES OF AMERICA )<br>)<br>)<br>v. )<br>)<br>WILLIAM ANTHONY MALONE, JR., )<br>Defendant. )<br>) | Criminal Case No. 3:22CR182 (RCY) |

## MEMORANDUM OPINION

This matter is before the Court on Defendant William Anthony Malone Jr.'s (hereinafter "Defendant Malone") Motion to Suppress (ECF No. 16). On May 1, 2023, the Court held a hearing on Defendant Malone's Motion to Suppress and denied such motion from the bench at the conclusion of the hearing. This Memorandum Opinion sets forth the Court's reasons for its decision.

## I. PROCEDURAL HISTORY

On December 6, 2022, Defendant Malone was charged in a one-count Indictment with Possession of a Firearm and Ammunition by a Convicted Felon, in violation of 18 U.S.C. § 922(g)(1). (ECF No. 1.) Specifically, the Indictment charged Defendant Malone with having possessed two firearms (a Rossi revolver and a Taurus revolver, both chambered in .357 caliber) along with various ammunition. (ECF No. 1.) On March 27, 2023, Defendant Malone filed a Motion to Suppress (ECF No. 16) that sought to suppress statements he made to officers and a magistrate before he was read his *Miranda* warnings and a Motion in Limine (ECF No. 17) that sought to exclude certain evidence of other alleged acts. On April 10, 2023, the Government filed its Responses, noting that it will only be disputing the Motion to Suppress and that it does not plan on introducing the statements that were the subject of the Motion in Limine. (ECF Nos. 18, 20.)

On April 17, 2023, Defendant Malone filed his Reply (ECF No. 23), and the Court set the matter for a hearing.

## II. FACTUAL BACKGROUND

At approximately 2:00 A.M. on August 23, 2022, Officer Barnes-Christian and Officer Sledge of the Richmond City Police Department were sitting in their parked patrol vehicle in the Gilpin Court housing project. Defendant William Anthony Malone, Jr. approached Officer Barnes-Christian, who was seated in the passenger seat of the marked police vehicle, and informed the officers that he was helping a woman move her belongings. Officer Barnes-Christian observed a bulge in Defendant Malone's waistband and asked Defendant Malone if he had a permit for the firearm he was carrying. At that point, Defendant Malone started to back away from the officers, and a chase ensued. The officers chased Defendant Malone through the Gilpin Court area. Officer Barnes-Christian told Defendant Malone to drop the weapon at which point Defendant Malone tossed the firearms on the ground and continued running. While Officer Sledge stopped to recover the firearms, Officer Barnes-Christian caught up to and arrested Defendant Malone, placed him in handcuffs, and ran Defendant' Malone's personal identifiers. Thereafter, Officer Barnes-Christian discovered that Defendant Malone had multiple warrants pending for his arrest and a prior felony conviction. After Defendant Malone was detained, Officer Barnes-Christian activated his body-worn camera ("BWC") that he wore on his chest. At no point did Officer Barnes-Christian or Officer Sledge read Defendant Malone his *Miranda* rights.

Officer Barnes-Christian transported Defendant Malone to the Richmond City Jail via the "sally port," and started the booking process at the jail. During this time, Officer Barnes-Christian conversed with Defendant Malone, who was worried about his term of imprisonment with the

charges he potentially faced. Officer Barnes-Christian informed Defendant Malone that he could "make a deal" with the Commonwealth Attorney for a lesser amount of time.[1]

At approximately 4:30 A.M., Officer Barnes-Christian took Defendant Malone before a magistrate at the Richmond City Jail. Officer Barnes-Christian's body worn camera was turned on at this time and continued to record both audio and video during Defendant Malone's time in front of the magistrate. (*See* BWC Footage, ECF No. 28-3.) At the Richmond City Jail, the magistrate first held a hearing to determine if there was probable cause to sign an arrest warrant for Defendant Malone. The magistrate informed Defendant Malone that he would be asking the officer a "couple of questions to see if there's probable cause . . . for the arrest," and told Defendant Malone to wait until he is done speaking with the officer to make any statements. (Transcript 1, ECF No. 28-2.) After the magistrate heard the officer's summary of what had occurred and asked some clarifying questions of the officer, the following exchange occurred:

> MAGISTRATE: Alright, Mr. Malone, you've heard everything the officer has said. Before making a probable cause determination, this is your opportunity to make any statements that you'd like. But before you do so, you must bear in mind two things. The first is that you do not have to speak to me—if you'd like not to speak to me that is just fine, your silence doesn't hurt you, I won't hold it against you, and I'll draw no inferences from it. If on the other hand you do wish to make a statement, you are seated right next to a police officer, so whatever you say could be used against you if and when this matter goes to court. So bearing that in mind, if you'd like to make any statements, please let me know, I'll swear you in and I'll let you— listen to whatever you want to tell me. If, on the other hand, you wish to remain silent, like I said, this is fine, it doesn't hurt you, just let me know so I can move on to the next portion of our hearing.
>
> MALONE: Yes, sir.

---

[1] In the Motion to Suppress, Defendant Malone alleges that while he was in police custody, officers, without providing him *Miranda* warnings, began interrogating Defendant Malone, asking questions like "What are you carrying a firearm for? You sell drugs or something?," to which he responded "No," and "You protecting yourself? I know it's a bad area," to which he answered "Yeah, I was protecting myself, man." Afterwards, Defendant Malone explained that he had walked up to the police because he did not want them thinking he and the woman were breaking into the apartment he was helping the woman with. While included in the Defendant's Motion to Suppress, Officer Barnes-Christian never articulated that he asked Defendant Malone these questions and the statements were not elicited from him during the suppression hearing. Moreover, the Government is not planning on introducing these statements in its case-in-chief.

> MAGISTRATE: I will assume, from that, that you wish to remain silent?
>
> MALONE: Yes, sir.
>
> MAGISTRATE: Alright.
>
> MALONE: I just didn't mean no harm—I didn't mean no harm, I just wanted to protect myself [unintelligible].

(*Id.* 2–3.) About three minutes after that exchange, and after the magistrate clarified some of the charges with the arresting officer, the magistrate stated:

> MAGISTRATE: Um, so I don't think I can write the, the stolen firearm. I can write the possession with a firearm, the firearm felon, two conceals? Which seems strange to me but I'll leave up to you, prosecution on that one. Um, I will get to work on that, and then I will ask some questions of you in a moment, Mr. Malone, uh, to see about setting you a bond. In the meantime, I will thank everybody in advance for their patience, while I get to the paperwork.

(*Id.* 4; BWC Footage.) Then, the magistrate and arresting officer filed out paperwork and the magistrate eventually signed an arrest warrant for Defendant Malone. (Transcript 4.) Ten minutes after the magistrate stated that he was planning on asking Defendant Malone some questions, the magistrate began asking Defendant Malone questions pertaining to his bond:

> MAGISTRATE: Alright, sir, I am going to ask you some questions that will help me determine your bond, to do that, I need to swear you in – of course since you're in handcuffs you do not need to raise your right hand. Sir, do you swear to tell the truth?
>
> MALONE: Yes, sir.
>
> MAGISTRATE: How long have you lived in the greater Richmond area?
>
> MALONE: All my life.
>
> MAGISTRATE: How long, um, do you have any family hereabouts?
>
> MALONE: Yes, sir.
>
> MAGISTRATE: What family members specifically do you have?

4

MALONE: What you mean, like my mother, my dad, my cousins—

MAGISTRATE: Have you ever been married, do you have any children?

MALONE: No.

MAGISTRATE: I'm sorry?

MALONE: One.

MAGISTRATE: One spouse or one child?

MALONE: One child.

MAGISTRATE: What's the highest level of education that you've completed?

MALONE: Uh, [unintelligible] the tenth.

MAGISTRATE: I'm sorry?

MALONE: Probably the tenth.

MAGISTRATE: And are you employed?

MALONE: Um, only part time.

MAGISTRATE: Doing what?

MALONE: Construction.

MAGISTRATE: Do you own any real estate or any motor vehicles here in the Commonwealth of Virginia?

MALONE: No, sir.

MAGISTRATE: Is your probation supervised or unsupervised?

MALONE: Sup—wait, when they tell you to call, what's that? That's supervised?

MAGISTRATE: Correct.

MALONE: [Unintelligible]

MAGISTRATE: Um, have you ever been charged with the failure to appear in court whether you were convicted or not?

MALONE: Sorry?

MAGISTRATE: Have you ever been charged with the failure to appear in court whether you were convicted or not?

MALONE: Have I ever been [unintelligible] failure to appear in court whatever convicted or not?

MAGISTRATE: Have you ever been charged—

MALONE: Yeah, I think I've been charged, I think I've been charged [unintelligible] I think so.

MAGISTRATE: [Unintelligible]

MALONE: Sir?

MAGISTRATE: Do you have any pending court appearances?

MALONE: No.

MAGISTRATE: Do you have anything else you wanted to add before I made a bond determination?

MALONE: I just, I just, what happened tonight was just, me, by having like the firearms on me, and just, being in that area anybody's going to have that type of, like, have that on them to protect theyself and that's all it was, I was not out there trying to harm nobody by havin' that on me and I just was helping my friend moving, move, like she was she was moving her clothes to another apartment section in Jackson Ward and I just was helping her out and the officers seen me with my concealed weapons and that's all but it's like, I don't, I don't, I don't feel like I'm a threat because I wasn't out there tryin' to like, rob nobody or shoot nobody, I just was helpin' a young lady move her stuff, that's all, that's all, [unintelligible] and I just, I feel like I'm a predator, I wasn't a predator, man.

(*Id.* 4–6; BWC Footage.) After this exchange, the magistrate determined that Defendant Malone would be held without bond given his history of failure to appear in court and the serious nature of him being a violent felon in possession of a firearm. (Transcript 6.)

### III. DISCUSSION

In the Motion to Suppress, Defendant Malone initially sought to suppress two different sets of statements: statements he gave to the police in response to questioning by the officers and

6

statements he gave in response to questioning by the magistrate. Prior to the suppression hearing, the government conceded that it was not seeking to introduce the statements Defendant Malone made in response to the police officers' questions during transport if this case proceeded to trial. (Gov't Resp. 2, ECF No. 2). Additionally, the government indicated during the suppression hearing that it was not seeking to use the brief statement Defendant Malone made to the magistrate during the probable cause hearing in the government's case-in-chief. As such, the only issue remaining for the Court to address is whether Defendant Malone's statement admitting that he was carrying firearms, made in front of the magistrate, during the bond hearing, which was captured on Officer Barnes-Christian's body-worn camera, was taken in violation of Defendant Malone's Fifth Amendment rights under *Miranda v. Arizona* and its progeny and in turn whether that statement should be suppressed at trial.

### A. The Routine Booking Question Exception Applies

The Fifth Amendment to the United States Constitution provides that "[n]o person ... shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. The Supreme Court has been clear that "the Fifth Amendment privilege is available outside of criminal court proceedings and serves to protect persons in all settings in which their freedom of action is curtailed in any significant way from being compelled to incriminate themselves." *Miranda v. Arizona*, 384 U.S. 436, 467 (1966). Specifically, the privilege attaches when a defendant is the subject of a "custodial interrogation." *Id*. at 444.[2] There is no dispute that Defendant Malone was in custody for *Miranda* purposes, thus the present inquiry boils down to whether Defendant

---

[2] There is conflicting authority under Virginia law as to whether *Miranda* applies to state magistrates. *Compare Commonwealth v. McDowell*, 2019 WL 3884211, at *2 (Va. Cir. Ct. 2019) (holding that magistrates are not required to give *Miranda* warnings), *with Commonwealth v. Wease*, 1998 WL 972242, at *1 (Va. Cir. Ct. 1998) (holding that *Miranda* can apply to magistrates in unique situations). The Court will analyze the suppression motion consistent with the holding in *Wease* and the stipulation of the parties.

Malone underwent an "interrogation" for *Miranda* purposes. An "interrogation" is defined as "express questioning or its functional equivalent, which includes 'any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect.'" *United States v. D'Anjou*, 16 F.3d 604, 608 (4th Cir. 1994) (quoting *Pennsylvania v. Muniz*, 496 U.S. 582, 600–01 (1990) (internal citations omitted)). However, the Supreme Court has created, and the Fourth Circuit has adopted, the Routine Booking Question Exception, which creates an exception in which *Miranda* warnings are not required because there is no "interrogation" under *Miranda* when a defendant is asked "routine booking questions" for the purposes of "securing 'biographical data necessary to complete booking or pretrial services.'" *D'Anjou*, 16 F.3d at 608 (quoting *Muniz*, 496 U.S. at 601).

In *Rhode Island v. Innis*, the Supreme Court first broadened the definition of "interrogation" for *Miranda* purposes from only express questioning, "to any words or actions on the part of the police (*other than those normally attendant to arrest and custody*) that the police should know are reasonably likely to elicit an incriminating response from the suspect." 446 U.S. 291, 300–01 (1980) (emphasis added). *Innis* represented the Supreme Court's first-time giving credence to the idea that questions and actions that were "normally attendant to arrest and custody" did not fall within the definition of "interrogation" for *Miranda* purposes and thus *Miranda* warnings were not required in those situations. *Id.* Ten years later, in *Pennsylvania v. Muniz*, a plurality of justices on the Supreme Court formalized this *Miranda* carve out as the "routine booking question" exception. 496 U.S. 582 (1990). In *Muniz*, the four-justice plurality stated that the "routine booking question" exception "exempts from *Miranda*'s coverage questions to secure the biographical data necessary to complete booking or pretrial services." *Id.* at 601 (internal

8

citations omitted). The questions in *Muniz* involved the defendant's "name, address, height, weight, eye color, date of birth, [and] current age . . . ." *Id.* at 590. The plurality noted that those questions were "requested for record-keeping purposes only, and therefore, those questions appear reasonably related to the police's administrative concerns," and thus the questions fell outside the scope of *Miranda* and were not suppressed. *Id.* at 601 (internal citations omitted).

In this case, by asking Defendant Malone the questions during the bond hearing, the magistrate was acting pursuant to his statutory mandate to conduct a pretrial bond or bail hearing. Section 19.2-82 of the Virginia Code states that if an arrest warrant is issued by a magistrate (as it was in this case), Virginia Code Sections 19.2-119 through 19.2-134.1 (entitled "Chapter 9 Bail and Recognizances, Article 1 Bail") shall be followed. Chapter 9 of the Virginia Code pertains to bail,[3] bond,[4] and recognizance.[5] When it comes to determining whether an individual is eligible for bail, the Virginia Code requires that anyone in custody pending a criminal trial shall be "admitted to bail by a judicial officer, unless there is probable cause to believe that: (1) He will not appear . . . or (2) His liberty will constitute an unreasonable danger . . . ." Va. Code Ann. § 19.2-210(A). In making the determination of whether the individual can be admitted to bail, the statute tells the judicial officer to consider:

> (i) the nature and circumstances of the offense; (ii) whether a firearm is alleged to have been used in the commission of the offense; (iii) the weight of the evidence; (iv) the history of the accused or juvenile, including his family ties or involvement in employment, education, or medical, mental health, or substance abuse treatment; (v) his length of residence in, or other ties to, the community (vi) his record of convictions; (vii) his appearance at court proceedings or flight to avoid prosecution or convictions for failure to appear at court proceedings; and (viii) whether the person is likely to obstruct or attempt to obstruct justice, or

---

[3] "'Bail' means the pretrial release of a person from custody upon those terms and conditions specified by order of an appropriate judicial officer. Va. Code Ann. § 19.2-119.
[4] "'Bond' means the posting by a person or his surety of a written promise to pay a specific sum, secured or unsecured, ordered by an appropriate judicial officer as a condition of bail to assure performance of the terms and conditions contained in the recognizance." *Id.*
[5] "'Recognizance' means a signed commitment by a person to appear in court as directed and to adhere to any other terms ordered by an appropriate judicial officer as a condition of bail." *Id.*

> threaten, injure, or intimidate, or attempt to threaten, injure, or intimidate, a prospective witness, juror, victim, or family or household member as defined in § 16.1-228.

*Id.* § 19.2-210(B). If the person is admitted to bail, Section 19.2-121 requires the judicial officer to conduct a bail hearing to fix the terms of the bail. In fixing the terms of bail, the judicial officer is told to take into account similar factors:

> (i) the nature and circumstances of the offense; (ii) whether a firearm is alleged to have been used in the offense; (iii) the weight of the evidence; (iv) the financial resources of the accused or juvenile and his ability to pay bond; (v) the character of the accused or juvenile including his family ties, employment or involvement in education; (vi) his length of residence in the community; (vii) his record of convictions; (viii) his appearance at court proceedings or flight to avoid prosecution or failure to appear at court proceedings; (ix) whether the person is likely to obstruct or attempt to obstruct justice, or threaten, injure, or intimidate, or attempt to threaten, injure, or intimidate a prospective witness, juror, or victim; and (x) any other information available which the court considers relevant to the determination of whether the accused or juvenile is unlikely to appear for court proceedings.

*Id.* § 19.2-121(A). When taken in the context of his statutory obligations, the questions that the magistrate asked during the bond/bail hearing[6] directly align with the factors that the Virginia Code instructs the magistrate to consider when making determination as to bail and bond. It is clear that the magistrate was acting according to his statutory obligation to conduct the bond hearing, gather the information from the defendant that the statute requires him to collect, and then make a bond determination. *See United States v. Gatson*, 357 F.3d 77, 82 (D.C. Cir. 2004) (finding that the Routine Booking Question Exception applied to questions regarding the ownership of a house because the officers asked the questions to comply with their mandate in Federal Rule of Criminal

---

[6] The magistrate uses the word "bond," during the hearing, but as the statute notes, bond is a condition of "bail," and thus the Court believes the magistrate was conducting a joint hearing to both determine the eligibility of Defendant Malone for "bail" and if so eligible, to fix the terms of his bail, including what amount to set the "bond." *See supra* notes 2–3. For clarity, the Court will refer to this joint hearing as a "bond hearing," as the magistrate did.

10

Procedure 4, which required the officers to give a receipt of any seized property to the owner of the property).

Moreover, the magistrate's questions during the bond hearing fell within the Routine Booking Question Exception because they were "normally attendant to arrest and custody" as the Virginia Code required the magistrate to conduct a bond hearing after the defendant was arrested and before the defendant proceeded to trial. *See* Va. Code Ann. §§ 19.2-82, 19.2-210–211.  During the bond hearing, the magistrate's questions served "to secure the biographical data necessary to complete booking or pretrial services." *Muniz*, 496 U.S. at 601.  The magistrate's questions were necessary for him to fulfill his statutory mandate—to determine whether Defendant Malone was eligible for admission to bail, a necessary pretrial service.  Additionally, the questions the magistrate asked, which all pertained to Defendant Malone's background, were "reasonably related" to the magistrate's "administrative concerns," namely his decision of whether to find Defendant Malone eligible for admission to bail, and if so, what terms to include in the defendant's bail.  *Id.*

Additionally, courts in the Fourth Circuit have held that the Routine Booking Question Exception applies to biographical data that goes beyond the very basic questions regarding one's name, address, date of birth, etc.  *See, e.g.*, *United States v. Elsheikh*, 578 F. Supp. 3d 752, 779 (E.D. Va. 2022) (holding that the Routine Booking Question Exception applies to the gathering of biometric data because the collection of such data "served administrative goals, such as identifying and tracking detainees, as well as other national security interests."); *United States v. Sanmartin*, No. 5:15-CR-328, 2016 WL 4506990, at *2 (E.D.N.C. Aug. 26, 2016) (holding that questions about the defendant's gang affiliation fell under the Routine Booking Question Exception because they "were part of a standard booking procedure aimed, in part, at addressing safety concerns.").

11

While the magistrate's questions did not concern extremely basic biographical data like one's name, address, or date of birth, the questions were necessary in allowing the magistrate to "secure the biographical data necessary to complete . . . pretrial services," which in this case involved determining whether Mr. Malone was eligible for bail. *Muniz*, 496 U.S. at 601.

Defendant Malone argues that the statement he gave to the magistrate during the bond hearing was an expansion or an elaboration of the statement he gave to the magistrate during the probable cause hearing and should be suppressed because he was not properly *Mirandized* during the probable cause hearing.[7] However, the Court finds no such bootstrapping exists between Defendant Malone's two statements. At the time Defendant Malone admitted to carrying firearms, the probable cause hearing had finished, and the magistrate had clearly informed Defendant Malone that he was moving on to the bond hearing. While separated in this instance by approximately ten minutes, the probable cause hearing and bond hearings are two distinct hearings that are both required under Virginia law. In Virginia, the judicial officer (or in this case, the magistrate) conducts the probable cause hearing to determine whether there was probable cause to issue an arrest warrant for a defendant. *See* Va. Code Ann. § 19.2-82. The arresting officer must bring a person arrested without a warrant before a judicial officer so that the judicial officer can determine whether there is probable cause to issue a warrant for the arrest of that individual. *Id.* § 19.2-82(A). The magistrate may "examine on oath the [officer] and any other witnesses," to determine if "there is probable cause to believe the accused has committed an offense." *Id.* § 19.2-72.

---

[7] Although some courts have addressed whether *Miranda* warnings are required at the probable cause hearing, *see United States v. Harris*, No. 3:08-CR-365, 2009 WL 68767 (E.D. Va. Jan. 6, 2009); *Commonwealth v. McDowell*, 2019 WL 3884211 (Va. Cir. Ct. Jan. 29, 2019), the Court does not address that topic here as that issue is not before the Court.

However, once the magistrate found probable cause to issue the arrest warrant for Defendant Malone, he shifted to the bond hearing as required by Virginia Code Sections 19.2-82(A) and 19.2-120–121. The purpose of this second hearing was materially different than that of the probable cause hearing, and the magistrate explicitly informed Defendant Malone that he was now switching to the bond hearing and would begin asking Defendant Malone a series of questions that would help him determine his bond. The questions the magistrate asked during the bond hearing were markedly different than the question asked during the probable cause hearing. Notably, the officer, who had been previously asked by the magistrate during the probable cause hearing to recount his side of the events leading up to the arrest, was not questioned by the magistrate during the bond hearing. Thus, given the time elapsed between the two statements, the change in the magistrate's questioning, and the explicit shift to the bond hearing from the probable cause hearing, the Court refuses to accept that Defendant Malone's statements during the bond hearing should be suppressed on the grounds that the statements were possibly related to a previous statement he gave during the probable cause hearing. *See United States v. Foster*, 227 F.3d 1096, 1103 (9th Cir. 2000) (refusing to suppress answers to routine booking questions when "subsequent inculpatory statements were unrelated to . . . [the] initial questions and were separated by both time and place from those questions.").

Thus, the Court holds that the questions asked by the magistrate during the bond hearing fell under the Routine Booking Question Exception to *Miranda*.

**B. The Questions were not "Designed to Elicit Incriminatory Admissions"**

Even though a question may be considered a booking question and fall under the Routine Booking Question Exception, *Miranda* warnings may still be required if the booking question is "designed to elicit incriminatory admissions." *Muniz*, 496 U.S. at 602 n.14. The plurality in

13

*Muniz*, while creating the Routing Booking Question Exception, also noted that "the police may not ask questions, even during booking, that are *designed* to elicit incriminatory admissions." *Id.* (emphasis added). The Fourth Circuit has adopted the plurality's intent-based caveat to the Routine Booking Question Exception. *See United States v. D'Anjou*, 16 F.3d 604, 608–09 (4th Cir. 1994), *cert. denied*, 512 U.S. 1242 (1994) (citing *Muniz*, 496 U.S. at 602 n.14). Having determined that the magistrate's questions during the bond hearing fell under the Routine Booking Question Exception, the Court now addresses whether the questions fell within the caveat to that exception, whether the booking questions were "designed to elicit incriminatory admissions." *D'Anjou*, 16 F.3d at 608.

In *D'Anjou*, the Fourth Circuit acknowledged the Ninth Circuit's incidental or effect-based interpretation of the caveat, but refused to address whether the Fourth Circuit should adopt a similar interpretation:

> D'Anjou cites to authority in other circuits, primarily the Ninth, that has elaborated upon the booking exception and held that, in certain instances, questioning regarding identity, address or other routine background matters may both be anticipated to provide incriminating evidence and in fact do so, and that such questioning gains no shelter from the booking exception. We do not reach the question of whether we should adopt this judicial gloss to the booking exception because we do not believe that the facts presented would support its application in this case.

*Id.* 608–09 (internal citations omitted). In *D'Anjou*, officers asked the defendant questions regarding his nationality and address. *Id.* at 609. There, the Fourth Circuit noted that

> there was no incriminatory element of the questioning until D'Anjou began supplying false information regarding his citizenship and place of birth. Because the incriminatory element was created by D'Anjou himself through his non-truthful responses, this case is unlike those in which a truthful response would in fact be incriminating and where the justification for an exception would be more persuasive. In addition, although D'Anjou gave as his address one of the stash houses, there is no evidence in the record disclosing that it was believed at the time to be a stash house or that the police anticipated that the question regarding D'Anjou's address would be incriminating.

*Id.*

It is clear that the questions the magistrate asked Defendant Malone during the bond hearing were not designed to elicit an incriminatory response. Here, like in *D'Anjou*, the magistrate's question of "Do you have anything else you wanted to add before I made a bond determination?" did not pose any sort of "incriminatory element" and the incrimination was only created by Defendant Malone's decision to answer the question in the way that he did. Furthermore, there is no evidence that the magistrate believed that Defendant Malone's response would be incriminating because none of Defendant Malone's other answers to the questions in the bond hearing were incriminating. The magistrate also asked the open-ended question after a series of background-type questions relating to Defendant Malone's family, his previous convictions, and his employment. Importantly, the magistrate did not ask any substantive questions about the pending charges during the bond hearing, so there was no reason for the magistrate to believe that Defendant Malone would provide an incriminatory response. Additionally, the open-ended question in the magistrate posed to Defendant Malone is vastly different than the incriminating question posed in *Muniz*, which concerned whether the defendant knew the date of his sixth birthday. *Muniz*, 496 U.S. at 598–99. In *Muniz*, the four-justice plurality held that the birthday question "left [the intoxicated defendant] with the choice of incriminating himself by admitting that he did not then know the date of his sixth birthday, or answering untruthfully by reporting a date that he did not then believe to be accurate." *Id.* at 599. No such coercive dilemma existed in this case. The magistrate asked questions as required of him by statute and then gave Defendant Malone the opportunity to add anything—if he so chose—to the background information the magistrate had inquired about throughout the bond hearing.

15

## IV. CONCLUSION

For the reasons stated above, the Court finds that the magistrate's questions during the bond hearing fell within the Routine Booking Question Exception, were not designed to elicit an incriminatory admission, and thus did not require *Miranda* warnings prior to being asked. Therefore, the statements Defendant Malone made to the magistrate during the bond hearing will not be suppressed.

An appropriate Order denying the Motion to Suppress shall issue.

/s/ *[signature]*
Roderick C. Young
United States District Judge

Richmond, Virginia
Date: May 8, 2023